# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **ADAM C. CLARK**, | Case No. 2:21-cv-864-SI |
| Plaintiff, | **OPINION AND ORDER** |
| v. | |
| **DR. GARTH GULICK, MICHELLE DAVIES, DR. CHRIS DIGIULIO,** and **E. SHAW**, | |
| Defendants. | |

Adam C. Clark, Plaintiff, *pro se.*

Ian Van Loh, Senior Assistant Attorney General, OREGON DEPARTMENT OF JUSTICE, 100 SW Market St., Portland, OR 97201. Of Attorneys for Defendants.

**Michael H. Simon, District Judge.**

Plaintiff Adam C. Clark, a self-represented adult in custody (AIC), sues Dr. Garth Gulick, Dr. Christopher DiGiulio, Michele Davis, and Elaine Shaw (collectively, Defendants). Clark asserts one claim under 42 U.S.C. § 1983, alleging that Defendants were deliberately indifferent to his medical needs in violation of his constitutional rights. Before the Court is Defendants' Motion for Summary Judgment (Defendants' Motion), ECF 34, which has been fully briefed by the parties. For the following reasons, the Court grants Defendants' Motion.

PAGE 1 – OPINION AND ORDER

Also before the Court is Clark's Motion to Make More Definite and Certain (Clark's Motion), ECF 48, to which Defendants did not respond. Clark's Motion, although styled as a motion for a more definite statement, is not a pleading motion under Rule 12 of the Federal Rules of Civil Procedure. Instead, the Court understands Clark's Motion to seek clarification about issues raised in Defendants' Motion. The Court will address separately Clark's Motion.

## STANDARDS

A party is entitled to summary judgment if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001). Although "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment," the "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 255 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quotation marks omitted).

A court must liberally construe the filings of a self-represented, or *pro se*, plaintiff and afford the plaintiff the benefit of any reasonable doubt. *Hebbe v. Pliler*, 627 F.3d 338, 342 (9th Cir. 2010). The Ninth Circuit further instructs that "an ordinary *pro se* litigant, like other litigants, must comply strictly with the summary judgment rules. *Pro se* inmates are, however, expressly exempted from this rule." *Thomas v. Ponder*, 611 F.3d 1144, 1150 (9th Cir. 2010)

(citation omitted). For a *pro se* inmate, courts "should avoid applying summary judgment rules strictly." *Id.* "This rule exempts pro se inmates from *strict* compliance with the summary judgment rules, but it does not exempt them from *all* compliance." *Soto v. Sweetman*, 882 F.3d 865, 872 (9th Cir. 2018) (emphases in original). The exception for *pro se* inmates does "not entirely release [an inmate] from any obligation to identify or submit some competent evidence supporting his claim." *Id.*

## BACKGROUND

### A. Relevant Medical Chronology

On January 28, 2018, while housed at Snake River Correctional Institute (SRCI), Clark was assaulted by two AICs. *See* Roberts Decl. Ex. 1 at 48 (ECF 36); Main Decl. ¶ 13. After this assault Clark was evaluated by a member of SRCI's medical staff, Registered Nurse (RN) Kimball. Roberts Decl. Ex. 1 at 48. RN Kimball noted several small bumps and abrasions to Clark's face and a small amount of blood hanging from the septum of Clark's nose. The notes from this encounter indicate that Clark denied having injuries that needed to be treated, and that RN Kimball reminded Clark to seek medical treatment if needed later. *Id.*

On January 30th, Clark reported to another member of SRCI's medical staff, RN Williams, that Clark's nose was broken. *Id.* at 47. On February 2nd, Clark asked to be seen at sick call for facial pain. On February 9, 2018, Clark apparently did not respond when sick call was announced for his housing unit. On March 6th, Clark was examined by Dr. Gulick. *Id.* at 17, 47; Roberts Decl. ¶ 8. Dr. Gulick prescribed fluticasone (Flonase), a corticosteroid used to treat nasal congestion, and ordered an additional pillow for Clark so that Clark could prop himself up at night. Roberts Decl. ¶ 8.

Clark was transferred to Eastern Oregon Correctional Institution (EOCI) on March 21, 2018. *Id.* ¶ 9; Roberts Decl. Ex. 1 at 45. The intake notes listed Clark's condition as stable and

note that Clark's special equipment needs included one extra pillow. Neither SRCI's nor EOCI's chart review from the date of Clark's transfer reference any complaints of facial or sinus pain. Roberts Decl. Ex. 1 at 45.

On April 2, 2018, Clark reported that he had been "hit in the nose and now [was having] a hard time breathing." *Id.* at 44. The examining medical provider observed that Clark's nose appeared straight with no deformities, and that Clark presented with mild swelling in both nostrils. The medical provider noted that it "[c]ould be allergies," but wrote that he would confer with Clark's primary care physician about consulting an ear, nose, and throat specialist (ENT). *Id.* Family Nurse Practitioner (FNP) Michelle Davies referred Clark for an x-ray of his nasal bone, which was performed the next day, April 3rd. *Id.* at 52. The diagnostic radiologist's findings were that Clark's "nasal bone demonstrates intact margins and normal alignment. The visualized facial bones show no acute abnormality and the sinuses are aerated." *Id.* Based on these findings, the radiologist's impressions were "negative," which Dr. Roberts explains to mean that the radiologist identified nothing of clinical interest. *Id.*; Roberts Decl. ¶ 11.

On April 16, 2018, Clark was examined by FNP Whitten-Bailey, who noted that Clark was "[c]omplaining of increased tiredness and lack of energy since being involved in [an] altercation and punched in [the] nose." *Id.* at 43. FNP Whitten-Bailey examined Clark's nose, noting "red mucosa and boggy, no deviated or perforated septum, polyps, bleeding," and that Clark was "able to blow equally through each nostril." *Id.* FNP Whitten-Bailey also noted that Clark's breath sounded equal and clear bilaterally. *Id.*

Four months later, on August 12, 2018, Clark submitted a non-emergency health care request in which he wrote: "I have seen nurses in the past here at EOCI about my breathing problems. I have not received that care that I believe that I need. Please make some time for me

to see the doctor." *Id.* at 79. On August 14th, Clark was examined by medical staff. *Id.* at 42. The medical provider noted that Clark reported having trouble breathing, especially since his time at SRCI. Clark reported having trouble catching his breath and waking up coughing and gasping for breath. *Id.* Clark also reported that Flonase helped with his symptoms and stated that he had been told that he needed to see an ENT. Clark stated that his symptoms had increased because of the then-present wildfire smoke in the air, and that he felt like his nose was constantly plugged up all the time. *Id.* The medical provider noted that Clark's nostrils showed bilateral redness and thin, clear mucus and that Clark's left nasal wall appeared to be slightly thicker on the left side than the right side. *Id.* at 16. On August 22nd, Dr. Leland Beamer reviewed Clark's medical chart and ordered that Clark be referred for an appointment related to his ENT issues. That appointment was scheduled for September 26, 2018. *Id.*

On August 24, 2018, Clark was examined by RN Maney for complaints of continued breathing issues. *Id.* at 41. Clark reported that it was hard for him to breathe, which limited his activity. Although Clark could walk and weight train, Clark reported being unable to run. RN Maney wrote that Clark was presented with no apparent distress and that Clark was breathing bilaterally. *Id.*

Clark presented at sick call on September 5, 2018, complaining that he was "having a hard time breathing," and stated that "he wakes up and feels like his throat is closed, and he can't breathe." *Id.* The medical provider noted that Clark's lungs were clear and his blood oxygen saturation was 98 percent. The medical provider noted that Clark would be referred to a nurse practitioner about a possible x-ray. That same day, a nurse practitioner reviewed Clark's chart, and referred Clark to behavioral health services. *Id.* On September 14th, Clark was examined by RN Maney after reporting continued symptoms of a "plugged" nose that cause Clark to awaken

from his sleep. *Id.* at 40. RN Maney noted that Clark did not present in apparent distress, and that

Clark's vitals were generally normal, and his blood oxygen saturation was 93 percent.

RN Maney also examined Clark two days later, on September 16th. In this encounter, Clark

complained of his nasal congestion continuing, and that it was harder to breathe in his unit and

easier to breathe in another unit. *Id.* RN Maney questioned whether Clark's reported symptom

increase related to anxiety. RN Maney also noted that Clark's right nostril was less than his less

nostril, his blood oxygen saturation was 100 percent, and that Clark was in no apparent distress.

*Id.*

On October 2, 2018, Clark was examined by Dr. Yin, who noted that since the injury to

Clark's nose, "breathing through [his] nose is difficult." *Id.* at 39; Roberts Decl. ¶ 19. Dr. Yin's

examination showed that Clark's left side nasal mucus was "very, very tough," but that the right

side was "normal looking." Roberts Decl. Ex. 1 at 39. Clark's blood oxygen saturation was 99

percent. *Id.* Dr. Yin prescribed Clark a saline nasal spray for his symptoms. *Id.*; *id.* at 15. Dr. Yin

saw Clark again on October 12th, when Clark continued to complain of breathing issues. *Id.*

at 39. Dr. Yin noted that Clark reported that the saline nasal spray made him feel better, but that

his nose still felt irritated. Clark's blood oxygen saturation was reported to be 99 percent. *Id.*

Dr. Yin noted that Dr. Beamer would be consulted about Clark's ongoing issues. *See id.*

Clark presented to sick call on October 31, 2018, stating that he was "still stuffed up." *Id.*

at 38. Clark told the medical provider, RN Wilks, that Clark's nose was still stuffy after his

appointment with Dr. Yin, and that the saline nasal spray "has been ineffective." RN Wilks noted

that Clark did not present with acute distress or breathing problems, other than the stuffy nose.

*Id.*

Dr. Beamer examined Clark on November 8, 2019. Dr. Beamer noted that Clark's nostrils looked normal and that the x-ray showed no nasal issues. *Id.* Dr. Beamer questioned whether Clark may have a nasal obstruction, indicated that he would approach the Therapeutic Level of Care (TLC) committee for approval of nasal expanders (*i.e.*, Breathe Rite strips), and ordered Clark an extra pillow. *Id.*; *id.* at 14. On December 18th, the TLC committee approved Clark's nasal expanders. *Id.* at 37.

On January 9, 2018, FNP Davies met with Clark, who was complaining of continued nasal congestion. *Id.* FNP Davies wrote that Clark reported that the prescribed Zyrtec, Flonase, Benadryl, and saline solution help his symptoms, but "then stop working." *Id.* FNP Davies wrote that Clark "[f]eels it is a structural issue and may need surgery." FNP Davies also wrote that Clark "[f]eels [that] something shifted" when he was hit in the face in January 2018, and that he awakens at night. Clark told FNP Davies that the TLC committee approved nasal expanders, but that he had yet to receive them. FNP Davies examined Clark, noting white secretion and mild swelling in Clark's nostrils, but otherwise noted normal findings. FNP Davies advised Clark to use the nasal expanders as instructed, and told him to follow up on his congestion issues with an appointment in two months. *Id.*

On January 15, 2019, the TLC committee reconsidered and denied Clark's request for nasal expanders. *See id.* at 75. Clark's progress notes dated January 30th reference Dr. DiGiulio and state that the request for nasal strips "should not have gone to" the TLC committee. *Id.* at 36. The notes continue: "Health Services is not going to order or be involved in [patients] getting nasal strips. This is an item that will only be obtained [through the] canteen." *Id.*

On January 23, 2019, Clark underwent a second x-ray examination. *See id.* at 51. The radiologist compared this x-ray to Clark's previous x-ray, and the radiologist's findings were that

"[t]he visualized paranasal sinuses appear normally aerated." *Id.* Based on these findings, a "negative" impression was noted, meaning that nothing unusual was observed. *Id.*; Roberts Decl. ¶ 26.

On March 6, 2019, Clark complained of nasal congestions and was examined by FNP Davies. Roberts Decl. Ex. 1 at 35-36. FNP Davies noted normal exam findings. *Id.*; Roberts Decl. ¶ 29. FNP Davies also noted that she would refer Clark's request for surgery and other treatment options to the TLC committee. Roberts Decl. Ex. 1 at 35. The TLC committee met and discussed Clark's condition and treatment options on March 12th, and the committee disapproved an ENT consultation but approved Cromolyn nasal spray (Nasacort). *Id.* at 74.

In May 2019, FNP Davies conducted a chart review of Clark's medical chart and noted that Flonase was no longer a medication available through the Oregon Department of Corrections (ODOC) medical services, and that she could discontinue Clark's Nasacort if it was not working. *Id.* at 34. On June 9th, Clark requested that the TLC committee approve his continued use of Flonase. *Id.* at 77. NP Davies referred Clark's request to the TLC committee, and the committee discussed, and denied, Clark's request on June 18th. *Id.* at 73.

Clark presented at sick call on July 24, 2019 with complaints of continuing sinus congestion and stating that the Nasacort is not effective. *Id.* at 33. Clark was advised to continue his current medications and that he would be scheduled for an evaluation from his provider. *Id.* Clark was examined by NP Davies on September 23rd. *Id.* at 31-32. NP Davies noted no findings that would explain Clark's ongoing nasal congestion and advised Clark to continue to use his medication as directed. *Id.* at 31.

On October 1, 2019, Clark performed a spirometry test, a test used to help diagnose and monitor respiratory conditions by measuring the air a person is able to expel in one forced

breath. *Id.* at 31; Roberts Decl. ¶ 35. FNP Davies reviewed the test results on October 8th, and noted that Clark's results were in normal range. Roberts Decl. ¶ 35.

On November 4th, Clark complained to NP Davies about experiencing difficulty breathing. Roberts Decl. Ex. 1 at 30. Clark's blood oxygen saturation was noted to be 99 percent. *Id.* NP Davies referred a new request for an ENT consultation to the TLC committee. *Id.* at 9. On November 5th, the TLC committee approved Clark's request for ENT evaluation. *Id.* at 72. Clark was examined by Dr. Flaiz, on December 11th. *Id.* at 69. Dr. Flaiz's examination revealed that there was "a sheath of tissue that entirely blocks [Clark's] left nasal pharynx out to or perhaps a little past the midline." *Id.* Dr. Flaiz noted that Clark could "still breathe air but it has to pass from left to right to proceed to his lungs." *Id.* Dr. Flaiz added that this finding was "peculiar" and that he was not sure if it was related to Clark's trauma or if it was an undiagnosed congenital problem. *Id.* Dr. Flaiz recommended a CT scan of Clark's sinuses. *Id.* The TLC committee approved Clark's CT scan, and the CT scan of his sinuses was performed on December 23rd. *Id.* at 68; *id.* at 49-50. The CT scan noted that Clark's CT scan was "normal" and showed no unusual findings. *Id.* at 49-50.

In March 2020, in response to the COVID-19 pandemic, Oregon's governor issued stay-at-home orders. Dr. Roberts, ODOC's Medical Director, states in his declaration that the pandemic resulted in the deferral of nonemergency examinations and treatments within Oregon's correctional system. Roberts Decl. ¶ 41.

Clark presented at sick call on June 24, 2020, complaining of, among other things, ongoing nasal congestion and asking about the results of the CT scan he had taken six months before. Roberts Decl. Ex. 1 at 29. NP Davies sent Clark the results of his CT scan on June 29th.

*Id.* at 28. Clark's medical records do not reflect any other medical encounters related to his sinus congestion between July and December 2020. Roberts Decl. ¶ 45.

Clark was next seen for his complaints of breathing difficulty on January 22, 2021. Roberts Decl. Ex. 1 at 27. At this encounter, Clark's blood oxygen saturation was noted to be 98 percent. *Id.* NP Davies forwarded to the TLC committee another request from Clark for follow-up with the ENT, and on January 26th, the TLC committee discussed and denied Clark's request. *Id.* at 65. The committee directed NP Davies to consult Dr. Flaiz for other treatment recommendations. *Id.*; *id.* at 5. Dr. Flaiz then told NP Davies that surgical removal was the only treatment option for the flap of skin that Dr. Flaiz identified in Clark's sinuses. *Id.* at 26. NP Davies relayed this information to the TLC committee, and on February 9th, the TLC committee approved surgery to treat Clark's nasal skin flap. *Id.* at 64.

Clark underwent outpatient surgery on April 20, 2021. *Id.* at 61-62. The medical records reflect that Clark received continuous post-surgery care from EOCI medical staff from April 20th through April 26th. *Id.* at 20-24. Clark was seen by NP Davies on May 4th to follow up on Clark's post-surgery recovery. *Id.* at 18. Clark's medical records do not reflect any further complaints about nasal obstruction. Roberts Decl. ¶ 63.

## B. Related Grievances

### 1. First Grievance

On February 28, 2018, Clark submitted his first of four grievances related to his ongoing sinus congestion issues. In grievance number SRCI.2018.03.001 (First Grievance), Clark wrote that he had been having difficulty setting up an appointment with a doctor to "find out if [his] nose [was] broken." Main Decl. Ex. 5 at 9 (ECF 35). Clark also wrote that due to his recovery from the injuries that he sustained in the assault one month prior, "this grievance might be late."

*Id.* Clark did not identify any individual as being involved with the incident being grieved. On March 5th, the First Grievance was accepted and sent for a response. *Id.* at 8.

On March 14, 2018, RN Williams responded to Clark's First Grievance, stating that she had reviewed the First Grievance and Clark's medical file and noted that she was aware of the January 28th altercation. *Id.* at 7. RN Williams noted that Clark had failed to respond to scheduled sick call on February 9th and stated that she could find no documented complaints of difficulty breathing or continued pain before Clark initiated the First Grievance. RN Williams also noted that Clark had seen Dr. Gulick on March 6th. RN Williams concluded: "It does appear . . . that the reason for your grievance was satisfied and you have seen and had the opportunity to discuss any injuries with the Doctor." *Id.*

Clark submitted an initial appeal of his First Grievance on August 10, 2018. *Id.* at 6. In his grievance appeal form, Clark stated: "My last grievance appeal form was never returned to me. I remember the day in which I put the form in the mail. My grievance appeal may have been lost in the mail." *Id.* Clark suggested that he would be initiating litigation against SRCI and stated that "[t]his grievance system does not appear to be working." *Id.* Clark contradicted the grievance response by stating that he did not intentionally refuse medical treatment, that he "recall[ed] asking for medical treatment numerous times," and implied that the reason that he missed sick call on February 9th was because he had a concussion. *Id.*

On August 27, 2018, Clark's initial appeal was returned for non-compliance. *Id.* at 5. Clark resubmitted the appeal form in September 2018. Main Decl. ¶ 12. On October 5, 2018, the grievance appeal was again returned to Clark for noncompliance. This notice stated that the reasons for the noncompliance determination included that appeals "must be filed within 14 calendar days of the date the employee response was sent to the inmate." Main Decl. Ex. 5 at 3.

On October 29, 2018, the SRCI Grievance Coordinator's Office received Clark's final appeal of the First Grievance. Main Decl. ¶ 13. Clark's final appeal was returned to him as denied, noting that, under ODOC rules, Clark could not appeal a denied grievance. Main Decl. Ex. 5 at 1. Clark took no further action with respect to the First Grievance.

### 2. Second Grievance

On January 20, 2019, Clark submitted grievance number EOCI.2019.01.075 (Second Grievance). Sobotta Decl. Ex. 5 at 8-9 (ECF 37). In this two-page grievance, Clark first complained of receiving conflicting information about the TLC committee's initial approval and subsequent denial of his nasal expanders. Clark then discussed more generally his ongoing sinus issues. Clark wrote: "Since I believe that I have structural damage in my nose[, t]he only solution is for me to have the necessary surgery to fix the problem." *Id.* at 9. Clark continued: "So far I have tried Flonase, Benadryl, [and] saline solution and nothing seems to help with breathing through my nose." *Id.* In the box that instructs the responded to describe what action should be taken to resolve the grievance, Clark wrote: "I want to be able to see an ENT. Also I want to be able to get the corrective surgery that I believe I need to fix my issue." *Id.* The Second Grievance was stamped as received by EOCI on January 25, 2019. *Id.*

On February 3rd, Clark received from Nurse Manager (NM) Eileen Purcell a response to the Second Grievance. *Id.* at 7. NM Purcell acknowledged the "confusion" over the nasal expanders and reiterated that the canteen is the appropriate place to obtain this type of item. NM Purcell also explained that FNP Davies had written to Clark on January 23rd and informed him that the TLC committee had denied his request for an ENT appointment "as it was not warranted" at that time, and noted that Clark had an appointment scheduled with FNP Davies to follow up on his nasal issues. *Id.*

PAGE 12 – OPINION AND ORDER

Clark submitted an initial appeal of the Second Grievance, which was received by EOCI on February 8, 2019. *Id.* at 6. In this appeal, Clark stated his disagreement with the response and asserted that because nasal expanders were unavailable at the canteen, his need for this product "falls directly on medical." *Id.* Clark stated that to resolve this grievance, he wanted "to be able to see an ENT. Also I want to be able to get the corrective surgery that I need to fix my breathing issue." *Id.*

On March 18th, Dr. DiGiulio responded to Clark's appeal of the Second Grievance. In, this response, Dr. DiGiulio again acknowledged the confusion surrounding the nasal expanders. *Id.* at 5. Dr. DiGiulio explained that an "ENT consult was not considered warranted for unilateral nasal congestion," but noted that NP Davies had ordered a second x-ray of Clark's sinuses to determine if a sinus issue was the cause of Clark's nasal congestion. *Id.* at 5.

On March 25, 2019, EOCI received Clark's final appeal of this grievance. *Id.* at 2. Clark asserted that Dr. DiGiulio was denying Clark medical treatment "for the structural damage" to Clark's nose by denying access to an ENT consult and by failing to provide nasal expanders until such as time as he could receive care from an ENT. Clark stated that Dr. DiGiulio's and the TLC committee's denial of medical care for Clark's serious medical condition "amounts to deliberate indifference and [poses] a serious threat" to Clark's "health and life." *Id.* Clark reiterated that, to resolve the Second Grievance, he wanted to see an ENT "for corrective surgery and to fix my breathing issues." *Id.*

On April 30th, Clark received from Joe Bugher, Health Services Administrator, a response to the final appeal. *Id.* at 1. In this response, Mr. Bugher stated that Health Services would not be supplying nasal expanders and noted that Clark's nasal congestion symptoms were being treated with various medications. Finally, Bugher notes that Clark's medical

documentation demonstrated that Clark was "being provided excellent medical care that is consistent with community standards." *Id.* at 1. By appealing the Second Grievance through the final appeal, Clark exhausted the Second Grievance. Sobotta Decl. ¶ 19.

### 3. Third Grievance

On July 29, 2019, EOCI received from Clark grievance number EOCI.2019.07.062 (Third Grievance). In the Third Grievance, Clark described an incident regarding a kyte he had submitted to the medical staff regarding his breathing issues. Clark wrote:

> On 7-16-19 I sent a kyte to medical regarding breathing issues which have been ongoing and well documented. Nurse Burnester answered my kyte by simply telling me the expiration date of the current treatment which I have clearly stated is not working. Nurse Burnester[']s [apathetic] answer shows the amount of deliberate indifference that Nurse Burnester has toward the suffering that I am being forced to live with.

Sobotta Decl. Ex. 6 at 8 (ECF 37). Clark also stated that he would like to be seen by an outside ENT. *Id.*

On August 21st, Clark received from NM Shaw a response to the Third Grievance. In this response, NM Shaw explained that all outside ENT specialist appointments needed to be approved by the TLC committee. *Id.* at 7. NM Shaw noted that Clark was scheduled for an appointment with NP Davies to follow up on Clark's nasal issues, and instructed Clark to discuss his treatment options with NP Davies at that time. *Id.*

On August 26th, EOCI received from Clark an initial appeal of the Third Grievance. In this appeal, Clark wrote:

> The error and or oversight of medical staff as[s]umptions and or unprofessional behavior of medical staff pre-conceived conclusions of congestion prior to consultation and determination of the TLC committee does not address [the] injury to my face and nose in a proper and professional manner; as noted by Health Services[,] traditional care . . . should be objective and non-judgmental.

*Id.* at 6. As for the prompt about what action Clark wants to be taken to resolve the grievance, Clark stated: "[1] That you send me a written recognition[]that congestion is a judg[]mental and pre-conceived assumption of my medical condition. [2] Send me to a nose [and] throat specialist." *Id.*

On October 25, 2019, Clark received from Dr. DiGiulio a response to the initial grievance appeal. Dr. DiGiulio explained that both of Clark's x-rays were normal, that consultation with an ENT was not medically indicated, and that Clark's medical providers recommended that Clark continue with his current course of treatment. *Id.* at 5. Dr. DiGiulio also stated: "I find no material support for allegations of unprofessional behavior or deliberate indifference. Additionally, the documentation shows that you have received excellent evaluation and treatment with additional follow-up pending." *Id.*

On November 6, 2019, EOCI received Clark's final grievance appeal related to the Third Grievance. Clark wrote as reasons for his disagreement with Dr. DiGiulio's response:

> The error and or oversight of medical staff assumptions and/or unprofessional behavior of medical staff pre-conceived conclusions of congestion prior to consultation of a non-biased doctor and or non-biased medical specialist (ENT). Medical staff has not provided me equal opportunity to pay for my medical needs by an (ENT). Therefore I have not been provided proper and professional medical services in a[n objective] and non-judg[]mental manner e.g. the biased doctor C. Digiulio, M.D. was more worried about legal terms and suit of deliberate indifference and/or covering up for unprofessional behaviors than providing to me un-biased medical review on my current breathing issues.

*Id.* at 2. In response to the prompt about what action Clark wanted to be taken to resolve the grievance, Clark wrote: "[1] An apology to me for C. Diguilio['s] biased views. [2] Allow me to see an ENT. [3] Surgery for my nose." *Id.*

On January 7, 2020, Clark received from Mr. Bugher a response to Clark's final appeal. In this response, Mr. Bugher reiterated that Clark's medical evaluations showed normal findings,

PAGE 15 – OPINION AND ORDER

that the TLC committee had found that an ENT consultation was not medically indicated, and that the medical documentation showed that Clark was receiving excellent medical care. *Id.* at 1. By appealing the Third Grievance through the final appeal, Clark exhausted the Third Grievance. Sobotta Decl. ¶ 26.

### 4. Fourth Grievance

On January 23, 2021, EOCI received grievance number EOCI.2021.01.126 (Fourth Grievance). In the Fourth Grievance, Clark wrote in relevant part:

> [1] According to Richard A. Flaiz M.D.F.A.C.S. (an ENT) there is a sheath of tissue that entirely blocks the left nasal pharynx out to or a little past the midline. Also my nose is minimally shifted. So he can breathe air but it has to pass from left to right to proceed to his lungs. [2] Every day I have problems breathing through my nose, nothing that Ms. Davies or any health services staff prescribed [such as] nasal spray[,] CT scan[,] ENT consult[,] [Benadryl,] or saline solution has fixed my breathing issue. My problem has gone on for close to three years. Please review my medical file. This is not an issue that is related to my congestion.

Sobotta Decl. Ex. 9 at 2 (ECF 37). In response to the prompt about what action Clark would like to see taken to resolve the Fourth Grievance, Clark wrote: "I would like to get corrective surgery to fix my problem. I would like to know what an E.N.T.[] diagnosis is. I would like to get my breathing problem fixed." *Id.* Clark indicated that "the date/time of incident giving rise to the grievance" was January 28, 2018. *Id.* Clark also listed Mr. Bugher, Dr. DiGiulio, and FNP Davis as the individuals whom Clark was grieving. *Id.*

On January 27, 2021, the Fourth Grievance was denied because the date of the incident was not within the 14 days of Clark's submission of the grievance. *Id.* at 1. Clark took no further action with respect to the Fourth Grievance.

## DISCUSSION

Defendants move for summary judgment on three grounds. First, Defendants argue that Clark failed to exhaust mandatory administrative remedies for some of the complained-of conduct. Second, Defendants argue that summary judgment is appropriate because Clark fails to establish that Defendants acted with deliberate indifference in violation of Clark's constitutional rights. Finally, Defendants argue that the doctrine of qualified immunity protects them from civil liability in this case.

## A. Failure to Exhaust Administrative Remedies

### 1. Applicable Law

The exhaustion provision of the Prison Litigation Reform Act (PLRA) states:

> No action shall be brought with respect to prison conditions under Section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a). Failure to exhaust under the PLRA is an affirmative defense and the defendant has the burden of "prov[ing] that there was an available administrative remedy, and that the prisoner did not exhaust that available remedy." *Albino v. Baca*, 747 F.3d 1162, 1172 (9th Cir. 2014) (en banc); *see also Jones v. Bock*, 549 U.S. 199, 204 (2007) (noting that failure to exhaust is "an affirmative defense the defendant must plead and prove"). A remedy is "available" when it is "available 'as a practical matter'; it must be 'capable of use; at hand.'" *Williams v. Paramo*, 775 F.3d 1182, 1191 (9th Cir. 2015) (quoting *Albino*, 747 F.3d at 1171) (quotation marks omitted). If a defendant makes the initial showing, a plaintiff then must "come forward with evidence showing that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him." *Albino*, 747 F.3d at 1172. Remedies are "effectively unavailable" when they are "ineffective,

unobtainable, unduly prolonged, inadequate, or obviously futile." *Williams*, 775 F.3d at 1191

(quoting *Albino*, 747 F.3d at 1172). "[T]he ultimate burden of proof," however, "remains with

the defendant." *Albino*, 747 F.3d at 1172.

### 2. Discussion

Defendants argue that summary judgment is appropriate because Clark failed to exhaust

mandatory administrative procedures available through ODOC's three-tiered grievance

procedure for conduct attributed to Dr. Gulick and NM Shaw and for conduct after January 20,

2020.

#### a. Failure to Grieve Dr. Gulick and NM Shaw

Defendants first contend that Clark was required under the Oregon Administrative Rules

(OARs) governing inmate grievances to grieve to exhaustion each named Defendant, and

because Clark failed to grieve to exhaustion Dr. Gulick and NM Shaw, summary judgment must

be granted in favor of those Defendants.[1] Defendants offer declarations from the grievance

coordinators at both SRCI and EOCI stating that AICs "are informed [of the ODOC grievance

procedure] in the Inmate Orientation Packet they receive when they first arrive at an ODOC

facility. Additionally, the information is contained in the inmate handbook and the inmate can

ask any housing unit officer for a grievance form. Inmate grievance instructions are also

available with the grievance forms." Main Decl. ¶ 7[2]; Sobotta Decl. ¶ 7. Defendants point to the

OARs governing inmate grievances submitted though October 17, 2019 and the OARs governing

---

[1] Defendants do not argue that Clark failed to grieve to exhaustion Clark's claims against Dr. DiGiulio or NP Davies.

[2] The paragraph numbering in the Main Declaration is not consistently sequential. To avoid confusion, the Court cites the sequential paragraph number.

inmate grievances submitted on or after October 18, 2019 as evidence of Clark's failure to exhaust. *See* Main Decl. Ex 2 (ECF 35); Sobotta Decl. Ex. 7 (ECF 37).

Subsection (5) of former OAR § 291-109-0140 (applicable to Clark's First, Second, and Third Grievances) states: "An inmate may not file more than one grievance regarding a single incident or issue unless more than one DOC or OCE employee, volunteer, or contractor is directly involved in the incident. *A separate grievance must be filed for each individual*." Main Decl. Ex. 2 at 5 (emphasis added). It is undisputed that Clark did not name Dr. Gulick or NM Shaw in any of Clark's first three grievances. It is unclear, however, whether this requirement was communicated to AICs in any of the instructions provided by ODOC. For example, the instructions appended to the Grievance Form omit former OAR § 291-109-0140(5) and otherwise does not reference the requirement that each individual must be separately grieved. *See* Main Decl. Ex. 3 at 2. Defendants do not offer as evidence the inmate handbook, nor offer evidence that the relevant provisions relating to this requirement are readily accessible to AICs. Thus, Defendants have not carried their burden to establish their entitlement to summary judgment based on the affirmative defense of Clark's failure to exhaust grievances against Dr. Gulick and NM Shaw.

### b.  Failure to Grieve Conduct After January 2020

Defendants also contend that Clark failed to grieve to exhaustion any conduct after the date of the final response to the Third Grievance, and thus Defendants assert that Clark may not maintain a deliberate indifference claim against any Defendant after that date. The evidence, viewed in the light most favorable to Clark, demonstrates that Clark repeatedly grieved the medical care he was receiving for his breathing issues and that two of the four grievances (the Second Grievance and the Third Grievance) were grieved to exhaustion. This evidence shows a question of fact related to whether Clark properly grieved the conduct that forms the basis for the

claim at issue. The Court declines to grant summary judgment on the ground of Clark's failure to exhaust administrative remedies.

**B. 42 U.S.C. § 1983 Claim**

The First Amended Complaint asserts a § 1983 claim and alleges that Defendants' inadequate medical care amounted to deliberate indifference to Clark's rights under both the Eighth and Fourteenth Amendments of the U.S. Constitution. As an AIC serving a custodial sentence, however, Clark's claim for constitutionally inadequate medical care may be brought only under the Eighth Amendment; Clark may not bring this claim under the Fourteenth Amendment. *See, e.g.*, *Sandoval v. County of San Diego*, 985 F.3d 657, 667 (9th Cir. 2021) ("Individuals in state custody have a constitutional right to adequate medical treatment. For inmates serving custodial sentences following a criminal conviction, that right is part of the Eighth Amendment's guarantee against cruel and unusual punishment. However, pretrial detainees have not yet been convicted of a crime and therefore are not subject to punishment by the state. Accordingly, their rights arise under the Fourteenth Amendment's Due Process Clause." (citations omitted)). Thus, notwithstanding Clark's references to the Fourteenth Amendment, the Court analyzes Clark's claim for inadequate medical care under the Eighth Amendment's subjective deliberate indifference standard.

**1. Applicable Law**

"Under 42 U.S.C. § 1983, to maintain an Eighth Amendment claim based on prison medical treatment, an inmate must show 'deliberate indifference to serious medical needs.'" *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). This requires a plaintiff to (1) "show a serious medical need by demonstrating that failure to treat a prisoner's condition could result in further significant injury or the unnecessary

and wanton infliction of pain"; and (2) "show the defendant's response to the need was deliberately indifferent." *Id.* (quotation marks omitted).

A "serious medical need" is "not the type of routine discomfort that is part of the penalty that criminal offenders pay for their offenses against society." *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992) (cleaned up), *overruled in part on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997). "Indications that a plaintiff has a serious medical need include the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Colwell v. Bannister*, 763 F.3d 1060, 1066 (9th Cir. 2014) (cleaned up).

Deliberate indifference is established only when the defendant subjectively "knows of and disregards an excessive risk to inmate health and safety." *Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004). It can be satisfied "by showing (a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference." *Jett*, 439 F.3d at 1096. "Indifference may appear when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care." *Id.* (quotation marks omitted). To be liable, a prison official must "both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

"Typically, a difference of opinion between a physician and the prisoner—or between medical professionals—concerning what medical care is appropriate does not amount to deliberate indifference." *Edmo v. Corizon, Inc.*, 935 F.3d 757, 786 (9th Cir. 2019) (cleaned up). A "mere delay of surgery, without more, is insufficient to state a claim of deliberate medical

indifference." *Shapley v. Nev. Bd. of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985). Additionally, even medical malpractice "does not become a constitutional violation merely because the victim is a prisoner." *Estelle*, 429 U.S. at 106.

### 2. Discussion

Clark's medical records show that Clark never presented to a medical provider in acute distress, never displayed vital signs that demonstrated that Defendants' prescribed course of treatment constituted a substantial risk of harm, and never indicated that any medical provider considered Clark's nasal condition to be potentially harmful or particularly dangerous. This evidence tends to negate finding that Defendants' delay in treating Clark with surgery "could result in further significant injury" or cause "the unnecessary and wanton infliction of pain" to Clark. *Jett*, 439 F.3d at 1096 (quotation marks omitted). Clark, however, submits evidence that his ongoing nasal issues affected his ability to engage in daily activities. *See generally* Clark's First Supplemental Exhibits, Ex. 3 (ECF 46 at 139-97). Whether this evidence shows that Clark's ongoing nasal congestion is a condition that "substantially affects" his activities of daily living, *see Colwell*, 763 F.3d at 1066, or is merely the "type of routine discomfort that is part of the penalty that criminal offenders pay for their offenses against society," *see McGuckin*, 974 F.2d at 1059 (cleaned up), is a factual determination not suitable for summary judgment.

Importantly, however, even if Clark's evidence satisfies the first step of the analysis, he has not demonstrated that Defendants harbored the subjective deliberate indifference required to prove a violation of the Eighth Amendment. Clark's medical providers examined Clark every time he requested medical treatment, prescribed different treatments, ordered specialized tests, approved consultations with specialists, and ultimately permitted an elective nasal surgery to alleviate Clark's symptoms. Put differently, Clark offers no evidence of "a purposeful act or failure to respond" to Clark's medical needs. *See Jett*, 439 F.3d at 1096. Further, Clark offers no

evidence that Defendants were "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]" as a result of the delay in treating Clark's nasal congestion with surgery and no evidence that Defendants actually drew that inference. *See Farmer*, 511 U.S. 837. Clark shows, at best, "a difference of opinion . . . concerning what medical care [was] appropriate" under the circumstances. *See Edmo*, 935 F.3d at 786. This does not amount to deliberate indifference under the Eight Amendment. Thus, Clark cannot satisfy the second step of the Eighth Amendment deliberate indifference analysis, and summary judgment on this claim is appropriate. Because the Court grants summary judgment on this ground, it does not reach the final argument raised by Defendants regarding Defendants' qualified immunity to civil liability.

## C.  Clark's Motion

Clark's Motion purports to seek clarification on three issues related to Defendants' Motion for Summary Judgment. Although framed as questions, the issues raised in Clark's Motion are more akin to argument; Clark's Motion may therefore reasonably be considered a surreply to Defendants' Motion. Clark's Motion identifies no new evidence creating a genuine issue of material fact, and therefore does not affect the Court's summary judgment ruling.

Because Clark is a self-represented litigant, however, the Court declines to strike Clark's Motion as improper and instead briefly addresses the issues raised. The first two questions raised by Clark's Motion are addressed in the above analysis and the Court offers no further clarification on those points. The third question in Clark's Motion ("How can defendants prevail on due process issues when defendants did not provide due process as directed by [the OARs and ODOC] policy[?]" (ECF 48 at 2)) is not addressed in the Court's analysis for two reasons. First, Clark's First Amended Complaint does not assert a claim for due process violations. Second, even if the First Amended Complaint properly asserted a due process claim related to

Defendants' alleged failure to follow policies, that claim could not be maintained because AICs "lack a separate entitlement to a specific prison grievance procedure." *Ramirez v. Galaza*, 334 F.3d 850, 860 (9th Cir. 2003); *see also Whitmore v. Pierce Cnty. Dep't of Cmty. Corr.*, 324 F. App'x 595, 596-97 ("The district court properly granted summary judgment on the claim alleging mishandling of Whitmore's grievances and 'kites' (written complaints about medical care) because inmates do not have a constitutional right to specific grievance procedures.").

## CONCLUSION

The Court GRANTS Defendants' Motion for Summary Judgment, ECF 34. The Court DENIES AS MOOT Clark's Motion to Make More Definite and Certain, ECF 48.

**IT IS SO ORDERED**.

DATED this 1st day of April, 2024.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge